# In the United States Court of Federal Claims

No. 11-200C
(Filed: May 9, 2013)

| | | |
|---|---|---|
| SALVATORE BORTONE, | ) | |
| | ) | |
| Plaintiff, | ) | Living Quarters Allowance eligibility |
| | ) | under the Overseas Differentials and |
| v. | ) | Allowances Act; 5 U.S.C. § 5923; |
| | ) | Department of State Standardized |
| THE UNITED STATES, | ) | Regulations §§ 031.11-.12; |
| | ) | Department of Defense Instruction |
| Defendant. | ) | 1418.1 |
| | ) | |

*Scott A. Simmons*, Richmond, VA, for plaintiff.

*Renee Gerber*, Civil Division, U.S. Department of Justice, Washington, DC, with whom were *Stuart F. Delery*, Principal Assistant Attorney General, and *Jeanne E. Davidson*, Director, Commercial Litigation Branch, for defendant.

## O P I N I O N

**FIRESTONE**, *Judge.*

Pending before the court is the defendant's ("government") motion for summary judgment in this action brought by plaintiff, Mr. Salvatore Bortone, a criminal investigator for the Europe and Africa Field Office of the Naval Criminal Investigative Service ("NCIS") in Naples, Italy, for wrongful denial of $284,000 in living quarter allowance ("LQA") plus interest and associated legal costs.[1] LQA is provided under the

---

[1] Plaintiff claims that he has been wrongfully denied LQA since at least 1981 when NCIS initially determined that he was ineligible for LQA. The statute of limitations to bring a Tucker Act claim before this court is six years. 28 U.S.C. § 2501. In recognition of the statute of

Oversees Differential and Allowance Act (the "Act"), 5 U.S.C. §§ 5921 et seq. to supplement the salary of eligible United States government employees stationed in foreign areas. Id. § 5923(a)(2). LQA can be provided for rent, heat, light, fuel, gas, electricity, and water. The Department of State implemented the LQA provisions through the promulgation of the Department of State Standardized Regulations ("DSSR").[2] Mr. Bortone lived in Naples when he was encouraged by NCIS personnel to apply for a position with the NCIS's Naples office. He applied for the job at NCIS and traveled to NCIS's office in Suitland, Maryland to be hired. Mr. Bortone argues that under the DSSR, he is eligible for LQA as someone who was "recruited" in the United States.

---

limitations, plaintiff only seeks damages for the six years prior to filing this action. In this connection, the plaintiff has invoked the continuing claims exception. The continuing claims exception applies in cases against the government where a new claim accrues each time a payment is due. Burich v. United States, 366 F.2d 984, 986 (Ct. Cl. 1966); see also Adde v. United States, 81 Fed. Cl. 415, 420 (2008) ("For each paycheck received which did not include a post allowance, plaintiff has a claim which accrued on the date she received the alleged underpayment."). Accordingly, plaintiff seeks damages only for the six years prior to instituting the instant action and the government has not raised a jurisdictional issue with respect to plaintiff's claim.

[2] As discussed infra, under the DSSR, LQA eligibility is determined based on whether the employee was "recruited" from within or outside of the United States. DSSR §§ 031.11-.12. If recruited from in the United States to work abroad, the employee may be granted LQA. DSSR § 031.11. If recruited from outside of the United States, (1) the employee's residence outside of the United States at the time of recruitment must be "fairly attributable" to the prior employment, (2) the employee must have been initially recruited from inside the United States by the prior employer, (3) the employee must have had an agreement with the previous employer that provided for return to the United States upon completion or separation from that previous job, and (4) the employment must be "substantially continuous" with the previous employer. DSSR § 031.12.

The government argues that the undisputed facts establish that the plaintiff is not eligible for LQA under the applicable statutory and regulatory scheme because he was not "recruited" in the United States.  Plaintiff argues that there are genuine issues of material fact relating to his eligibility for LQA which preclude granting summary judgment.

For the reasons discussed below, the court finds that there are no genuine issues of material fact regarding Mr. Bortone's eligibility for LQA and that Mr. Bortone is ineligible for LQA under the applicable law.  Accordingly, the government's motion for summary judgment is **GRANTED**.

## I.      Factual Background

The following facts are taken from the parties' briefing and associated exhibits and are undisputed unless noted otherwise.

### A.      Mr. Bortone's initial employment with the federal government at the Naples, Italy Navy Exchange

Mr. Bortone was born in Italy in 1934 and moved to the United States in the early 1960s, where he took up residence in New Jersey.  In 1968 he was naturalized, becoming a United States citizen.  While living in New Jersey, Mr. Bortone worked as a plumber for the City of Paterson Board of Education.  In July 1974, he traveled to Naples, Italy on vacation to visit relatives.  While in Italy, at the urging of an Air Force major with whom plaintiff was in contact, Mr. Bortone applied for a security job with the Naples Navy

Exchange, a Department of Defense ("DoD") non-appropriated fund instrumentality.[3] Mr. Bortone returned to New Jersey in August 1974 upon completion of his vacation.

In October 1974, after his return to New Jersey, plaintiff received a call from his brother living in Italy who said that the Navy Exchange was attempting to contact Mr. Bortone with a job offer. Mr. Bortone made contact with the Navy Exchange and was offered a job as a security guard, which he accepted. Before moving to Italy, he stored his furniture[4] and forwarded his mail to a friend's house located at 50 Third Avenue, Hawthorne, New Jersey.[5] Mr. Bortone never lived at this address either before or after he stored his furniture there and "maintained that address as a domestic address of record." Bortone Aff. ¶ 9, Pl. Ex. C, ECF No. 29-3.

In November 1974, Mr. Bortone moved to Italy to begin work as a security guard at the Navy Exchange. The position paid the lowest grade and step hourly wage rate. It required no prior experience. Mr. Bortone did not receive and was never offered either LQA or compensated travel rights back to the United States as part of his pay and benefits at the Navy Exchange. Indeed, the Navy Exchange never deemed Mr. Bortone

---

[3] Plaintiff states that it is a disputed fact whether Mr. Bortone applied to the Navy Exchange while on a tourist's visa, Pl. Opp. 6, but the government states that it does not dispute this fact. Def. Rep. 1.

[4] Mr. Bortone's friend, at the request of the Mr. Bortone, sold the furniture in or just after 1981 once Mr. Bortone determined that he would not need the furniture anymore. Bortone Dep. 151, Pl. Ex. E, ECF No. 29-5. The friend also subsequently sold the house where the furniture had been stored. Id.

[5] Plaintiff states that it is a disputed fact whether Mr. Bortone was a United States citizen and resident of New Jersey at the time of his employment by the Navy Exchange, Pl. Opp. 6, but the government states that it does not dispute these facts. Def. Reply 1.

to be eligible for a compensated return trip upon completion of his employment at the

Navy Exchange.  Plaintiff was issued a foreigner's work permit on January 29, 1975 and

began work[6] at the Navy Exchange where he remained until 1981, eventually becoming a

detective.

From the time plaintiff moved to Italy in 1974, through late 1979 or early 1980, he

lived with his brother in San Cipriano D'Aversa, Caserta, Italy.  Since that time, through

the present, Mr. Bortone has lived at a single address in Castel Volturno, Caserta, Italy.[7]

During the roughly six-year period of his employment at the Navy Exchange, Mr.

Bortone made only three trips back to the United States, each lasting about a week.  The

first trip was to attend the funeral service for his uncle in New Jersey, the second trip was

to renew his New Jersey driver's license, and the third trip was to interview and be sworn

in for the NCIS position, which is discussed in more detail in the following section.

### B.      Mr. Bortone's Naples recruitment and Maryland hiring for employment at NCIS's Naples office

In 1981 the special agent in charge of NCIS[8] in Naples, Mr. Charles Bickley,

expressed his desire to have Mr. Bortone come work for him in a newly created position

as a drug laboratory support technician.  Bortone Dep. 102, Def. Ex. 1, ECF No. 28-1

---

[6] The parties dispute the exact date of when Mr. Bortone began his work at the Navy Exchange, with Mr. Bortone stating that he "unofficially" began work prior to the issuance of the January 1975 work permit.

[7] The parties dispute whether Mr. Bortone's purpose for staying in Italy during this time frame was solely attributable to his continued employment with the United States government.

[8] At the time, the agency was called the Naval Investigative Service, or NIS.  For the purposes here and for the sake of simplicity, the court will refer to the agency by its current name, NCIS, regardless of its contemporaneous name during the relevant timeframe.

("Bickerly [sic], said we want Sal to work with us."); Bickley Aff. 1, Pl. Ex I, ECF No.

29-9.  NCIS believed that Mr. Bortone was particularly well qualified for the position.

Bortone Dep. 102.  The job description was written by staff in NCIS's Suitland,

Maryland office and did not expressly state that the duty station would be in Naples.

NCIS sent the description to Mr. Bortone in Naples.  Bortone Dep. 21.  Mr. Bickley,

believing that plaintiff would be a good employee, requested plaintiff to complete an

application for the position.  Bortone Dep. 103; Bickley Aff. 1.  In response to Mr.

Bickley's overture to apply, plaintiff filled out a personal qualification statement for the

NCIS position, listing his Castel Volturno residence as his address.  Personal

Qualification Statement, Def. Appx. 43.  Mr. Bortone further noted on the personal

qualification statement that he would only accept a position in Naples.  Id.  He also noted

that his purpose for leaving his job as a plumber for the Paterson Board of Education—

the job he held just before work began at the Navy Exchange—was because of a death in

the family.[9]  Id.  Mr. Bortone signed the document on February 24, 1981.  During this

period, Mr. Bickley contacted Mr. J. Brian McKee, then the head of the Administration

Department at the Suitland office, and told him that plaintiff was the "only one [who] can

make [the Naples] lab run."  Bortone Dep. 105.  Mr. Bortone was told, prior to

interviewing, that the NCIS position "will be your job."  Bortone Dep. 245.  The two

---

[9] Notwithstanding the contemporaneous reason provided for leaving his job as a plumber just
before moving to Italy and taking the Navy Exchange job, plaintiff subsequently denied in his
2010 responses to interrogatories that anyone in his family died in 1974 or 1975.  Def. Appx. 21.
Mr. Bortone also states that he actually had been working for a short while at a private firm as a
plumbing contractor just prior to leaving for Italy.

agreed that Mr. Bortone would fly to the Suitland office to be sworn into his position.

Mr. Bortone recalls that Mr. Bickley sent him to Suitland "to be hired."  Bortone Dep.

246.  Mr. John J. D'Avanzo, who worked at the Suitland office when Mr. Bortone was

hired and subsequently served as Special Agent in Charge of the Naples office, also

remembers Mr. Bortone as a "stateside hire."  D'Avanzo Aff. 1, Pl. Ex. J, ECF No. 29-

10.

NCIS arranged for plaintiff to fly to the Suitland, Maryland office at his own

expense for what was described as the "recruitment process."  Hiring Memo, Pl. Ex. D,

ECF No. 29-4.  Mr. Bortone subsequently interviewed with Mr. McKee, signed his

appointment affidavit, and took his oath of office in Suitland for the Naples laboratory

position on July 20, 1981.  He resigned from his Navy Exchange job three days later on

July 23, 1981.[10]  On July 24, 1981, NCIS executed a "Request and Authorization for

DOD Civilian Permanent Duty Travel" ("July 24, 1981 Travel Authorization").  See Def.

Appx. 55.  The July 24, 1981 Travel Authorization, which was signed by Mr. McKee,

authorized "Travel Between Official Stations" but explicitly noted at the bottom that

there would be "No Cost to the Government."[11]  Id.  The box labeled "Return from

Overseas for Separation" remained unchecked.  Id.

---

[10] Plaintiff states that it is a disputed fact whether Mr. Bortone was continuously employed by the Navy Exchange immediately prior to beginning work at NCIS, Pl. Opp. 7-8, but the government states that it does not dispute that Mr. Bortone was continuously employed.  Def. Reply 1.

[11] Notwithstanding the language contained in the July 24, 1981 Travel Authorization, plaintiff contends that "[i]t was Mr. McKee's intent and expectation that Mr. Bortone . . . would receive all benefits normally given to such United States citizen employees upon arrival in Italy."

7

Despite the paperwork signed in Suitland, Maryland, the Naples personnel office took issue with the apparent lack of adequate appointment information necessary to process plaintiff's (and other employees') hiring into the Naples location.  Ms. Connie Simone, a personnel staffing specialist who handled Mr. Bortone's processing in Naples, expressed concern and frustration with new hires repeatedly arriving in Naples for duty without the necessary documentation.  See Processing Memo, Def. Appx. 58-60. Accordingly, after his return to Naples from Suitland, Mr. Bortone was asked to sign a second appointment affidavit—identical to the first he had signed in Suitland—which he did on July 27, 1981.[12]  The second affidavit was signed by Ms. Simone in Naples.  In addition, Mr. Bortone signed a document titled "Transportation Agreement Oversea Employ."  Mr. Bortone signed the document on August 19, 1981.[13]  The Transportation Agreement Oversea Employ document stated:

> 5 U.S.C. 5722 provides, under certain conditions, for travel and transportation expenses of the employee and his immediate family, movement and storage of household goods and personal effects . . . .  Under the law, the allowances contained therein shall not be authorized unless the employee agrees in writing to remain in the Government service for a prescribed period of time.  Accordingly, to establish eligibility for travel and transportation the following agreement must be executed.

Transportation Agreement Oversea Employ, Def. Appx. 61.  The document contained a number of terms relating to the duration of employment and the circumstances by which

---

Compl. ¶ 12.

[12] Mr. Bortone has expressed "doubts" as to the authenticity of his signature on this document and does not recall whether he took the oath of office again in Naples.  Bortone Dep. 24-25.

[13] Mr. Bortone asserts that this document was actually signed on July 19, 1981.

an employee may leave the position without forfeiting transportation rights when otherwise meeting the conditions necessary for such benefits.  The agreement stated that plaintiff's "Place of Actual Residence at Time of Appointment" was 50 Third Avenue, Hawthorne, New Jersey—the address of Mr. Bortone's friend where Mr. Bortone was storing his furniture.  Def. Appx. 61.

Following a request for LQA in October 1981, the Director of the Navy's Consolidated Civilian Personnel Office informed plaintiff and NCIS in a memo that plaintiff was not eligible for LQA under the DSSR's eligibility criteria.  LQA Eligibility Modification Memo, Def. Appx. 62-63.  The Memo explained that Mr. Bortone was deemed a "local hire" because he listed his Castel Volturno residence as his address on the February 24, 1981 personal qualification form, and therefore he was not eligible for LQA under the regulations governing eligibility for persons recruited in the United States.  Def. Appx. 62.  The Memo further stated that Mr. Bortone failed to meet the criteria necessary to receive LQA as a local hire under the eligibility criteria for persons recruited outside the United States because he did not have a return travel agreement back to the United States with the Navy Exchange, his prior employer.  Def. Appx. 62.

### C.    Mr. Bortone's subsequent efforts to obtain LQA before the Navy and before the United States Office of Personnel Management

After the Navy initially denied Mr. Bortone's request for LQA in 1981, he continued to seek LQA benefits over the ensuing decades.  In 1987 NCIS's Regional Director for Operations for Europe rejected plaintiff's request for LQA on the grounds that there was no "tangible evidence of residence" in the continental United States at the

time of employment at NCIS.  1987 LQA Eligibility Memo, Pl. Ex. N, ECF No. 29-14.

In 1994 the Navy's Office of Civilian Personnel Management (now the Office of Civilian

Human Resources) ("OCPM") rejected Mr. Bortone's request for LQA on the grounds

that Mr. Bortone's employment appeared to stem from his chosen "home of record" in

Naples and that he did not live in Naples solely for the purpose of his employment at

NCIS.  1994 LQA Eligibility Memo, Pl. Ex. M, ECF No. 29-13.  In 1995 OCPM denied

plaintiff's request to reconsider the conclusions in the 1994 memo.  1995 LQA Eligibility

Memo, Pl. Ex. L, ECF No. 29-12.

Mr. Bortone did not seek LQA again until 2008, when he filed a claim before the

United States Office of Personnel Management ("OPM"), pursuant to 31 U.S.C. §

3702(a)(2),[14] seeking to set aside the Navy's denial of his LQA.  OPM File No. 08-0098,

Decision (Apr. 16, 2010).  Plaintiff claimed that he was entitled to LQA on two

alternative bases identified in the DSSR.  First, plaintiff claimed he was entitled to LQA

because he was "recruited" into the NCIS from the United States by virtue of his hiring in

Suitland, Maryland.  In the alternative, plaintiff claimed that he was eligible as a "local"

hire because (1) he had been employed with the Navy Exchange immediately before

---

[14] 31 U.S.C. § 3702(a)(2) provides that "The Director of the Office of Personnel Management shall settle claims involving Federal Civilian employees' compensation and leave." Implementing regulations promulgated by OPM in part 178 of title 5, Code of Federal Regulations ("C.F.R.") provide that settlement of such claims before OPM is based only upon the written record.  5 C.F.R. § 178.105.  Where, as here, agency review of a claim arising under 31 U.S.C. § 3702 is limited to a review of the written record and does not afford the federal employee an opportunity to affirmatively rebut the merits of the opposing party's case, the agency's resulting decision does not preclude the federal employee from pursuing the claim in the United States Court of Federal Claims.  Roberta B. v. United States, 61 Fed. Cl. 631, 635-36 (2004).

employment with NCIS, (2) the Navy Exchange had recruited him in the United States, and (3) the NCIS had provided him with return transportation to the United States.

OPM rejected each basis for Mr. Bortone's LQA claim on April 16, 2010.  OPM explained that Mr. Bortone was not eligible for LQA under DSSR § 031.11 reasoning that because "the claimant was living in Italy at the time he was selected for his [NCIS] position, his status was that of a local hire when he was appointed to that position."  OPM File No. 08-0098 at 12.  OPM stated that Mr. Bortone's travel to Suitland, Maryland had "no bearing on this determination."  Id.  With regard to Mr. Bortone's contention that he was eligible for LQA as a local hire and recruited outside the United States, OPM deferred to NCIS's previous conclusion that Mr. Bortone did not meet the eligibility requirements under DSSR § 031.12.

Plaintiff filed the instant action before the United States Court of Federal Claims on March 30, 2011.

## II.     Standard of Review

When considering a summary judgment motion, the court's proper role is not to "weigh the evidence and determine the truth of the matter," but rather "to determine whether there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a) of the Rules of the United States Court of Federal Claims ("RCFC"); see also DIRECTV Gr., Inc. v. United States, 670 F.3d 1370, 1374-75 (Fed. Cir. 2012).  A material fact is one that "might affect the outcome of the suit," and a dispute is genuine

"if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.  In reviewing the facts, "all justifiable inferences are to be drawn" in favor of the party opposing summary judgment.  Id. at 255.

Once the movant has shown that no genuine issue of material fact exists, the party opposing summary judgment must demonstrate that such an issue does, in fact, exist. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  To establish a genuine issue of material fact, a party "must point to an evidentiary conflict created on the record; mere denials or conclusory statements are insufficient." Radar Inds., Inc. v. Cleveland Die & Mfg. Co., 424 Fed. Appx. 931, 936 (Fed. Cir. 2011) (quoting SRI Int'l v. Matsushita Elec. Corp. of Am., 775 F.2d 1107, 1116 (Fed. Cir. 1985)) (internal quotation omitted). Where there is doubt as to the existence of a genuine issue of material fact, that doubt must be resolved in favor of the nonmovant.  Unigene Labs., Inc. v. Apotex, Inc., 655 F.3d 1352, 1360 (Fed. Cir. 2011) (citing Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc., 520 F.3d 1358, 1360-61 (Fed. Cir. 2008)).

## III.   Discussion

### A.   Legal framework for LQA eligibility

As discussed above, LQA is authorized under the Overseas Differentials and Allowances Act, 5 U.S.C. § 5923(a)(2),[15] which established a government-wide framework for paying certain types of cost of living allowances to eligible civilian

_____

[15]  The version of the statute applicable to plaintiff's employment at both the Navy Exchange and NCIS is substantially the same with the only difference being a cross reference to another provision that subsequently changed.  See Act of Sept. 6, 1966, Pub. L. 89-554, §5923, 80 Stat. 378, 511 (1966).

employees.  The Act did not include eligibility requirements and instead granted broad

authority to the President to promulgate regulations governing eligibility.  President

Eisenhower delegated this broad authority to the Secretary of State through executive

order.  See Exec. Order No. 10903, 1961 WL 8156 (Jan. 9, 1961).  Under this authority,

the Secretary of State adopted regulations governing LQA eligibility requirements

through the DSSR.  The DSSR include two sets of eligibility requirements depending on

whether the subject employee was recruited within or outside the United States.  See

DSSR §§ 031.11-.12.

DSSR § 031.11 sets the requirements for employees recruited within the United

States, providing in relevant part that "Quarters allowances prescribed in Chapter 100

may be granted to employees who were recruited by the employing government agency

in the United States. . . ."  DSSR § 031.11.  Section 031.12 provides the minimum

eligibility requirements for employees recruited from outside of the United States.

Section 031.12 provides in relevant part:

> Quarters allowances prescribed in Chapter 100 may be granted to
> employees recruited outside the United States provided that:
>
> a. the employee's actual place of residence in the place to which the
> quarters allowance applies at the time of receipt thereof shall be fairly
> attributable to his/her employment by the United States government; and
>
> b. prior to appointment, the employee was recruited in the United States,
> the Commonwealth of Puerto Rico, the Commonwealth of the Northern
> Mariana Islands, the former Canal Zone, or a possession of the United
> States, by
>
>> (1) the United States Government, including its Armed
>> Forces;

(2) a United States firm, organization or interest;

(3) an international organization in which the United States Government participates; or

(4) a foreign government

and has been in substantially continuous employment by such employer under conditions which provided for his/her return transportation to the United States . . . .

DSSR § 031.12.

Moreover, DSSR § 013 further delegates authority to the heads of other agencies to implement the applicable LQA provisions promulgated by the Department of State. Under this sub-delegation, the DoD promulgated DoD Instruction ("DoDI") 1418.1, Payment of Differentials and Allowance in Foreign Areas, which "implements" DSSR §§ 031.11-.12 and provides "supplemental instructions for determining employee entitlements" for LQA for all times relevant to this litigation.[16]  DoDI 1418.1 ¶ (I)(A). DoDI 1418.1 provided that eligibility for locally hired DoD employees—those hired under DSSR § 031.12—"will be determined at the time of hire and redetermined any time pertinent changes in circumstances occur."  DoDI 1418.1 ¶ (B)(1)(a).

**B.    Legal framework for review of agency interpretation of regulations**

The framework established in Chevron, U.S.A. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984), sets the standard by which courts determine whether an agency's statutory interpretation is reasonable.  Under Chevron, the court first determines "whether Congress has directly spoken to the precise question at issue."  Id. at

---

[16] DoDI 1418.1 was cancelled on November 24, 1981 and superseded by DoD Civilian personnel Manual 1400.25-M.

842.  The court looks to the language of the statute itself to determine Congressional

intent.  Delverde, SrL v. United States, 202 F.3d 1360, 1363 (Fed. Cir. 2000).  Beyond

the statute's text, the court may use other tools of statutory construction to determine the

intent of Congress.  Heino v. Shinseki, 683 F.3d 1372, 1378 (Fed. Cir. 2012).  If

Congress' intent is clear, the inquiry ends.  If, however, the court cannot ascertain the

intent of Congress, the court asks whether the implementing agency's interpretation of

the statute is reasonable.  Chevron, 467 U.S. at 843; Heino, 683 F.3d at 1377.

Where the agency's decision is based on an interpretation of its own regulations

rather than on the statute, its interpretation is controlling "unless plainly erroneous or

inconsistent with the regulation."  Auer v. Robbins, 519 U.S. 452, 461 (1997).  Under the

Auer standard, "an agency's interpretation need not be the only possible reading of a

regulation—or even the best one—to prevail."  Decker v. Nw. Envtl. Def. Ctr., 133 S. Ct.

1326, 1337 (2013).  Rather, the court will consider whether the agency's interpretation of

the regulation is a "fair and considered judgment on the matter in question."  Auer, 519

U.S. at 462.  While deference is generally only afforded to an agency's interpretation of

its own rules and regulations, Allegheny Teledyne, Inc. v. United States, 316 F.3d 1366,

1378 (Fed. Cir. 2003), courts will give deference to an agency's interpretation of

regulations drafted by another agency where, as here, the interpreting agency adopts and

administers the subject regulations.  Sec'y of Labor v. Excel Mining, LLC, 334 F.3d 1, 7

(D.C. Cir. 2003).  This is particularly true when an agency is given authority to

implement the regulations of another agency.  Paralyzed Veterans of Am. v. D.C. Arena

L.P., 117 F.3d 579, 585 (D.C. Cir. 1997).

### C.    Mr. Bortone is not entitled to LQA under DSSR § 031.11

The government argues that summary judgment is appropriate with regard to Mr.

Bortone's eligibility under DSSR § 031.11 because the undisputed facts demonstrate that

the Navy reasonably determined that Mr. Bortone was "a local hire" and thus ineligible

for LQA under DSSR § 031.11.  Plaintiff argues that summary judgment is not

appropriate because there are genuine issues of material fact in dispute over whether

plaintiff was "recruited" in the United States within the meaning of DSSR § 031.11.

Specifically, plaintiff asserts that his travel to Suitland, Maryland to be sworn in to the

NCIS position, together with Mr. McKee's, Mr. Bickley's, and Mr. D'Avanzo's

statements regarding his status as a "stateside hire" establish that he was "recruited" in

the United States.  The government argues in response that the above-noted facts

regarding Mr. Bortone's travel to Suitland, Maryland are not disputed but instead are

immaterial.  The government argues that a reasonable reading of DSSR § 031.11 supports

the Navy's determination that Mr. Bortone, who identified himself as a resident of

Naples, Italy, and who was encouraged and applied for an NCIS job in Naples, Italy was

a "local hire" and was not "recruited" inside the United States as required by DSSR §

031.11.  For the reasons that follow, the court agrees with the government and holds,

taking all of the facts into account, that Mr. Bortone was not eligible for LQA under

DSSR § 031.11 because the Navy reasonably determined that he was a "local hire" and

not recruited inside the United States.

As stated above, DSSR § 031.11 provides that LQA "may be granted to

employees who were recruited by the employing government agency in the United States

. . . ." The government agrees that Mr. Bortone, under the Navy's application of the subject regulations, would be eligible for LQA if he was in fact "recruited" in the United States. The central issue, therefore, is whether Mr. Bortone was "recruited" in the United States. The term is not defined in either the Act or the DSSR. Accordingly, the court must determine whether the Navy properly construed the phrase "recruited in the United States" to exclude individuals who live abroad, are encouraged to apply for a job and then apply for a job in the foreign location but travel to the United States for the purposes of being formally hired and sworn in.

The word "recruit" does not appear in 5 U.S.C. § 5923, the statutory provision authorizing LQA, or in 5 U.S.C. § 5922, the provision granting the President authority to promulgate regulations governing the administration of LQA. The word "recruitment" does appear, however, in the "purposes" Section of the Overseas Differentials and Allowances Act. This Section states that LQA should be used to "facilitat[e] for the Government the recruitment and retention of the best qualified personnel for civilian service overseas." Overseas Differentials and Allowances Act of 1960, Pub. L. 86-707, § 101(4), 74 Stat. 792, 792 (1960) (emphasis added). Thus, while the word "recruitment" is not defined in the Act, it appears from the statute that the purpose of LQA is to provide an incentive to prospective employees to move overseas to work for the federal government. See Acker v. United States, 620 F.2d 802, 806 (1980) ("Acker I") (finding that the goal of offering LQA to employees "recruited in the United States" is to provide compensation for additional costs associated with living abroad). Accordingly, the Act's purposes indicate that only prospective employees who actually live in the United States

17

need LQA as an incentive to move abroad.  Acker v. United States, 6 Cl. Ct. 503, 508
(1984) ("Acker II").  Those who voluntarily live abroad do not need to be "enticed" by
the offer of LQA to leave the United States.  Id.; see also Tyler v. United States, 220 Ct.
Cl. 387, 389 (1979) (stating that LQA would be a "bonus" for employees already living
abroad).  Construing the term "recruitment" in the context of the Act's purposes therefore
supports the Navy's view that to be "recruited in the United States" requires evidence that
plaintiff was not a local resident, already living in the area of his prospective
employment.

The Navy's interpretation is also supported by the ordinary meaning of the word
"recruitment."  It is well-settled that when a statute or regulation does not provide the
definition of a term, courts construe the term in accordance with its ordinary or natural
meaning.  Taniguchi v. Kan Pac. Saipan, Ltd., 132 S. Ct. 1997, 2002 (2012); Cardiac
Pacemakers, Inc. v. St. Jude Medical, Inc., 576 F.3d 1348, 1362 (Fed. Cir. 2009).
Dictionaries can serve as the basis for determining the plain meaning.  See, e.g. Fed. Exp.
Corp. v. Holowecki, 552 U.S. 389, 408 (2008).  The third edition of Webster's New
International Dictionary ("Webster's Third"), published just after Congress passed the
Act, defines "recruitment" as "an act of offering inducement to qualified personnel to
enter a job or profession."  Webster's Third 1899 (3d. 1961).  Thus, the contemporaneous
understanding of the word "recruitment" supports the Navy's contention that LQA is not
available under DSSR § 031.11 to individuals already living in the local area and
therefore do not need to be induced to live abroad to work for the federal government.

The plaintiff challenges this reading of the word "recruitment" by arguing that other and apparently more recent definitions of "recruitment" include the concept of "hiring" and here there is no dispute that plaintiff was "hired" in the United States.  Pl. Resp. 10 (citing Webster's New Collegiate Dictionary (9th ed. 1987) (defining "recruit" as "to secure the services of: ENGAGE, HIRE")).

The court finds that plaintiff's reliance on this definition is not supported to the extent that the definition suggests that the Navy's reading of the regulation is unreasonable.  In light of the preceding discussion, plaintiff's proffered definition—that "to recruit" or recruiting simply means "to hire" or hiring—is inconsistent with the contemporaneous definition.[17]  Plaintiff's reading of "recruit" to mean "hire" is also inconsistent with the stated purposes of LQA.  Had Congress intended for recruitment to mean hiring, it would have used the word "hire" rather than "recruitment."  See Shoshone Indian Tribe of Wind River Reservation v. United States, 364 F.3d 1339, 1347 (Fed. Cir. 2004) ("[T]here exists a strong presumption that 'Congress expresses its intent through the language it chooses' and that the choice of words in a statute is therefore deliberate and reflective.") (quoting INS v. Cardoza-Fonseca, 480 U.S. 421, 433 n.12, 436 (1987)).  Moreover, the implementing regulations distinguish between "recruitment" and "hiring."  For example, to describe the process by which an agency secures new employees, DoD

---

[17] It is noted here that courts use definitions contemporaneous with the enactment of the relevant statute or regulation to determine the meaning of undefined terms.  Reves v. Ernst & Young, 494 U.S. 56, 77 (1990); see also Nielson v. Shinseki, 607 F.3d 802, 807-08 (Fed. Cir. 2010) (using a contemporaneous definition of an undefined term to determine Congress's intent).  Plaintiff's reliance on a definition from a dictionary published nearly thirty years after the passage of the Act is of limited value.

provides that LQA eligibility is made "at the time of hire," DoDI 1418.1 ¶ (B)(1)(a),

underscoring that recruitment is different from hiring.

Further, the Navy's reading of "recruitment" to mean something other than "to

hire" is consistent with decisions of other agencies that similarly interpreted "recruited in

the United States" to exclude individuals living abroad from LQA eligibility.  See In the

Matter of Drach, GSBCA No. 13863-RELO, 98-1 BCA (CCH) ¶ 29,442 (noting that

under DSSR § 031.11, "recruited from the United States meant that the employee resided

permanently in the United States . . . from the time the employee applied for a position

until the date the employee accepted a formal offer.") (internal quotations removed).  In

Drach, the Army denied the claimant LQA on the grounds that she was living abroad

when she applied for the position.  Id.

In view of the foregoing discussion, the court agrees with the government that the

Navy reasonably determined that plaintiff was a "local hire" and therefore ineligible for

LQA under DSSR § 031.11.  The undisputed facts establish that Mr. Bickley, the special

agent in charge of the NCIS Naples field office contacted and encouraged Mr. Bortone to

apply for the drug laboratory position while Mr. Bortone was working in Naples for the

Navy Exchange.  Thus, Mr. Bortone's initial contacts with NCIS were all made in Naples

and were initiated by NCIS in Naples.  Bortone Dep. 102-03.  The facts further establish

that Mr. Bortone did not need incentive to stay in Naples.  To the contrary, the

undisputed evidence established that Mr. Bortone stated in his application that he would

only take the NCIS job if it were in Naples.  In this connection, it is also not disputed that

Mr. Bortone listed his Castel Volturno address as his residence on the personal qualification statement for the NCIS position.

Thus, the undisputed facts establish that the Navy reasonably concluded that Mr. Bortone was "recruited" in Naples, regardless of his trip to Maryland to be "hired."  See Acker I, 223 Ct. Cl. at 290 ("There is no indication that Congress intended to grant people already in those foreign areas extra compensation to give them living situations as though they had come from the United States.").  The Navy reasonably concluded that the location of Mr. Bortone's actual hiring was not material to the question of where he was recruited for purposes of determining LQA.

It is for these same reasons that plaintiff's reliance on Mr. McKee's, Mr. Bickley's and Mr. D'Avanzo's statements identifying plaintiff as a "stateside hire" is misplaced. None of the statements submitted by the plaintiff indicate that Mr. Bortone was "recruited" in the United States.  None of the statements establish that LQA was ever offered to Mr. Bortone as an incentive to move to Naples.  The fact that Mr. Bortone's superiors in Naples later explained that they "intended" for Mr. Bortone to receive LQA does not bind the government.  A federal employee's reliance on incorrect legal advice or conclusions from a government representative does not create a legal entitlement to benefits otherwise not provided by statute or for which the employee is otherwise ineligible.  See, e.g. Poillucci v. Dep't of Justice, 459 F.3d 1351, 1355-56 (Fed. Cir. 2006) (finding that plaintiff had no legal entitlement to retirement benefits notwithstanding agency's expressed view that he was eligible for those benefits) (citing OPM v. Richmond, 496 U.S. 414, 426 (1990)).

For all of the above-cited reasons, the government is entitled to summary judgment on Mr. Bortone's claim for LQA under DSSR § 031.11.

### D.      Mr. Bortone is not entitled to LQA under DSSR § 031.12

The government argues that it is also entitled to summary judgment on Mr. Bortone's claim that he is eligible for LQA as an employee recruited outside the United States under the terms of DSSR § 031.12(b).  The government contends that Mr. Bortone does not satisfy the criteria for LQA under DSSR § 031.12(b) because he never had a return travel agreement with the Navy Exchange, his first employer in Italy, and that the Navy's resulting conclusion was reasonable.  Plaintiff argues that summary judgment should be denied because there are genuine issues of material fact regarding his eligibility under DSSR § 031.12(b).  Specifically, plaintiff argues that he has presented facts to show that he meets the eligibility criteria because he was "continuously employed" at the Navy Exchange, his residency in Naples at the time of his hiring at NCIS was "fairly attributable" to his prior employment with the Navy Exchange, he was initially living in the United States when he applied to the Navy Exchange, and that he was entitled to return travel agreement with the Navy Exchange.  Mr. Bortone concedes that he never had a return travel agreement with the Navy Exchange but argues that his right to an agreement from the Navy Exchange together with the one he obtained from NCIS establishes his eligibility.  While not disputing any of these facts, the government responds that Mr. Bortone is not eligible as a matter of law because he did not have a return travel agreement with the Navy Exchange and the agreement with NCIS does not satisfy the regulatory criteria for eligibility.  The court agrees.

In order to be eligible for LQA as an employee recruited outside the United States, DSSR § 031.12(b) requires that the new hire demonstrate that he had been employed by the previous employer "under conditions which provided for his/her return transportation to the United States."  By its plain language, DSSR § 031.12(b) establishes such a return agreement as a necessary element of LQA eligibility for employees recruited outside of the United States.  See In Re Pierce, GSBCA No. 15201-RELO, 001 BCA ¶ 30,816 (holding that claimant's lack of a return agreement for his previous Japan-based employment precluded him from LQA eligibility under DSSR § 031.12(b) when he received a new position in Japan).  While plaintiff contends that he should have been granted return transportation to the United States upon his initial employment with the Navy Exchange in 1974 or 1975,[18] the undisputed facts demonstrate that he had no such return agreement with the Navy Exchange and that he had worked there for six or seven years without receiving one. Where, as here, the undisputed facts demonstrate that the plaintiff had no return agreement with the previous employer, the plaintiff cannot successfully claim LQA eligibility under DSSR § 031.12 even if all the remaining elements are established or in dispute.  Accordingly, on the facts before the court, Mr.

---

[18] Plaintiff states that he was "not advised of his right to return travel" by the Navy Exchange and further states that there is a genuine issue of material fact whether the "circumstances of his employment [with the Navy Exchange] provided for his return transportation to the United States, in the language of the DSSR."  Pl. Resp. 8 n.7.  The government does not appear to dispute the factual circumstances related to Mr. Bortone's employment with the Navy Exchange. The court notes that plaintiff points to no fact on the record or legal basis to suggest that such a circumstance resulted in government waiver of the return agreement requirement under DSSR § 031.12.

Bortone cannot establish eligibility for LQA as an employee recruited outside the United States by NCIS.

Further, the court also agrees with the government that neither the July 24, 1981 Travel Authorization issued by NCIS nor the "Transportation Agreement Oversea Employ" document Mr. Bortone signed with NCIS establish Mr. Bortone's LQA eligibility under DSSR § 031.12. Section 031.12(b) requires that eligibility for LQA depends on the employee having such an agreement with the *previous* employer—in this case the Navy Exchange. Both of these documents, which plaintiff claims provided return transportation to the United States, were signed in connection to his employment with NCIS and not with the Navy Exchange. Mr. Bortone had no such agreement with the Navy Exchange. For this same reason, the mobility agreements Mr. Bortone executed over the years while employed by NCIS have no impact on this determination. DSSR § 031.12 by its plain terms requires that the employee demonstrate that he had a return agreement in place with the previous employer. Indeed, DoDI 1418.1 provided that eligibility for employees hired under DSSR § 031.12 "will be determined at the time of hire." DoDI 1418.1 ¶ (B)(1)(a); Angelo Raffin, B-184972, 1976 WL 10295, *3 (Comp. Gen. May 5, 1976) (noting that determinations of LQA eligibility are made at the time of appointment absent a change of applicable law). Thus, the subsequent mobility agreements, even if valid, do not retroactively establish Mr. Bortone's LQA eligibility under the DSSR § 031.12 at the time of hire at NCIS.

For all of these reasons, the court holds that the Navy properly found plaintiff ineligible for LQA under the DSSR § 031.12 and thus the government is entitled to summary judgment on this claim.

**IV.      Conclusion**

For the foregoing reasons, the government's motion for summary judgment is **GRANTED**.  Each party shall bear its own costs.  The Clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

s/Nancy B. Firestone
NANCY B. FIRESTONE
Judge